UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
NEREIDA BALOTTI,

              Plaintiff,

              -against-

SPRING VALLEY CARE LLC,
MEDRITE SPRING VALLEY LLC,
MEDRITE LLC,
MEDRITE MEDICAL CARE, P.C.,
MEDRITE CARE LLC,
ALAIN MASS,
SAMUEL FISCH,


              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Case No.: 21-cv-6140

**COMPLAINT**

Plaintiff Demands
a Trial by Jury

## PRELIMINARY STATEMENT

      Plaintiff NEREIDA BALOTTI ("Plaintiff" or "BALOTTI") complains pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") as amended and New York State law, and seeks damages to redress the injuries Plaintiff suffered as a result of, *inter alia,* sex/gender discrimination, hostile work environment, retaliation, constructive termination, assault, battery, and intentional infliction of emotional distress.

## JURISDICTION & VENUE

1. This Court has federal question jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331.

2. This Court has supplemental jurisdiction over the related New York State law causes of action asserted in this complaint pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b) because the events or omissions which gave rise to the claims asserted herein occurred within this Court's

jurisdiction.

4. Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

## **PARTIES**

5. At all times material, Plaintiff was and is an individual female residing in the State of New York.

6. At all times material, SPRING VALLEY CARE LLC was and is a domestic limited liability corporation, duly existing by the virtue and laws of the State of New York.

7. At all times material, MEDRITE SPRING VALLEY LLC was and is a domestic limited liability corporation, duly existing by the virtue and laws of the State of New York.

8. At all times material, MEDRITE LLC was and is a domestic limited liability company, duly existing by the virtue and laws of the State of New York.

9. At all times material, MEDRITE MEDICAL CARE, P.C. was and is a domestic professional corporation duly existing by the virtue and laws of the State of New York.

10. At all times material, MEDRITE CARE LLC was and is a domestic limited liability company, duly existing by the virtue and laws of the State of New York.

11. At all times material, the above corporate Defendants all share common ownership and control over "MedRite" facilities and staff, including hiring and firing of employees.

12. At all times material, Defendant ALAIN MASS ("MASS") was and is a supervisor at MedRite facilities.

13. At all times material, MASS was Plaintiff's immediate supervisor.

14. At all times material, SAMUEL FISCH ("FISCH") owns and operates MedRite.

## MATERIAL FACTS

15. In or around October of 2018, Defendants hired Plaintiff as a Radiologic Technologist.

16. At all times material, Defendants employed Mass as their medical director at Defendants' 175 Route 59, Spring Valley, New York location.

17. Defendants employed and continued to employ Mass despite knowing Mass has a history of sexual harassment.

18. At all times material, Mass was and is Plaintiff's superior, manager, and supervisor. At all times material, Mass had the authority to direct Plaintiff's daily work activities and held the authority to take tangible employment actions against Plaintiff.

19. At all times material, Mass was a proxy and/or "alter ego" for MedRite.

20. At all times material, in a typical work week, Plaintiff and Mass would work together every Tuesday for a twelve (12) hour shift.

21. In or around 2019, Mass became increasing flirtatious with Plaintiff and subjected Plaintiff to multiple, unwanted compliments.

22. In or around 2019, Mass would greet Plaintiff by saying "I loved your beautiful smile since 2018."

23. In or around 2020, Mass would tell Plaintiff he could imagine her smile even with a mask on because he knew her "eye gestures."

24. In or around June of 2020, Plaintiff briefly went out on medical leave due to a broken foot.

25. In or around August of 2020, Plaintiff returned to work from medical leave. Upon her return, Mass informed Plaintiff how much he missed her.

26. On or about August 11, 2020, Mass entered Plaintiff's x-ray office. Mass again informed Plaintiff how much he missed her and how Plaintiff would "brighten up" his day.

27. Later that same day, Mass again approached Plaintiff and told her "I wanted to buy to two dozen roses." Plaintiff informed Mass that was unnecessary.

28. Later that same day, Mass again entered Plaintiff's x-ray office. Within, Mass offered to give Plaintiff a massage. Plaintiff politely declined Mass' offer. Mass told Plaintiff "I just want to see your foot, if you need any type of treatment, I'm an MD." Mass then stood above Plaintiff while Plaintiff sat, bent down, grabbed Plaintiff's leg, and held it up against his. Plaintiff told Mass she did not want a massage. Mass, disregarding Plaintiff, then removed Plaintiff's shoe, sock, and compression sleeve. Plaintiff pleaded with Mass to "please stop" and specifically told him "don't do this." After Mass rubbed Plaintiff's foot and garnered whatever sexual pleasure he wanted from the interaction, Mass put Plaintiff's leg down. Plaintiff put her sock and shoe back on immediately. Plaintiff did not bother putting on her compression sleeve, as she wanted to get her shoe back on as quickly as possible.

29. Plaintiff was disgusted by Mass' behavior. Plaintiff began to discuss Mass' behavior with other employees. Many employees confirmed similar behavior Mass exhibited toward them. Additionally, many employees shared that Defendants' management knew of Mass' sexual behavior with both patients and employees and have failed to take any remedial action.

30. On or about September 8, 2020, Mass entered Plaintiff's x-ray office. Within, Mass asked Plaintiff personal questions regarding her marriage. Mass then asked Plaintiff if she was the "submissive or dominate" partner in her relationship. Plaintiff told Mass his question was very personal. Mass told Plaintiff "we are friends," and he wants to "talk freely." Mass then informed Plaintiff he was the "submissive" partner and his wife wanted him to be more dominant. Mass then added that divorce occurs when there is two dominant people in the relationship. Mass then shared with Plaintiff that he and his wife have been in therapy for

fifteen (15) years and their therapist thinks his wife is authoritarian in their relationship. Mass then told Plaintiff he wished his wife was more like Plaintiff.

31. This conversation made Plaintiff extremely uncomfortable. Plaintiff deflected and eventually left the room.

32. In or around August or September 2020, Plaintiff was not feeling well at work. Plaintiff told her colleagues, including Mass, she was not feeling well. Mass then ordered Plaintiff bloodwork. Mass ordered Plaintiff an HIV, other STD, and EBV blood test. Plaintiff found that order very strange and was uncomfortable her director ordered bloodwork for sexually transmitted viruses.

33. On or about September 15, 2020, Plaintiff had an earache. She asked Mass to examine her inner ear. Mass prepared some anti-inflammatory drops. Mass went to administer the drops into Plaintiff's ear. While doing so, Mass pushed his body up against Plaintiff's body and began to rub his erect penis up and down on Plaintiff's body. Mass began to position his penis in his pants, pushing his penis down with his hand. Plaintiff saw this and immediately left the room.

34. Later that same day, Mass entered Plaintiff's x-ray office and asked Plaintiff to slap him in the face and tell him to get back to work. Plaintiff was disgusted and told Mass "no." In response, Mass told Plaintiff he didn't like another employee because they called him sir, and he found that degrading. He added it made the other employee look like a "peasant." After that strange comment, Plaintiff asked Mass to please leave. Mass refused. Instead, Mass then asked Plaintiff to be his mistress and "master." He shared with Plaintiff he wanted to kiss her feet and wanted to be her "slave."

35. Plaintiff —shocked and disturbed by the unwanted sexual comments—told Mass she was a

married woman and would not participate. In response, Mass told Plaintiff "You're making my dick hard." Mass then told Plaintiff **"look what you're doing to me, you're making my dick hard. I'm aroused."** Plaintiff became upset and told Mass he was making her uncomfortable. As Plaintiff grew noticeably upset, Mass left the room.

36. Later that same day, roughly a half hour later, Mass came back to Plaintiff's x-ray office. Mass apologizes for being disrespectful. Plaintiff told him, again, she was married and that Mass needs to go to therapy. Mass left the office.

37. Again, later that day, this time in the break room, Mass approached Plaintiff. Mass thanked Plaintiff for "listening" to him and told Plaintiff he was a "woman trapped in a man's body." Mass further stated that if it were not for his religion and the fact that he's in medicine, he would have had gender reassignment surgery. Mass went into further detail telling Plaintiff, among other things, that he is disgusted by men, that he cross dresses in his wife's wigs, lipstick, and stockings, that he desires to watch another man have sex with his wife, and that he holds an affinity towards lesbians, among other, sexual comments. Mass went on, saying he had a cleaning lady at his home and he was submissive in front of her, which embarrassed his wife.

38. Plaintiff was deeply disturbed by her director's unwanted sexual comments. Plaintiff —in complete shock—told Mass she feels sorry he was feeling this way.

39. Mass did not end the conversation. He continued, telling Plaintiff he had not masturbated in forty (40) years because in his religion wasting semen is considered a sin. Plaintiff was disgusted.

40. That evening, Plaintiff spoke to a co-worker. Said co-worker confirmed that earlier that day Mass showed her a video of him masturbating.

41. Given Mass' incessant sexual harassment and how uncomfortable Plaintiff was, Plaintiff did not work the following two Tuesdays (September 22 and 29).

42. In or around October of 2020, Plaintiff returned to work, as Mass was out for various religious holidays.

43. On or about October 18, 2020, Mass attempted to call Plaintiff multiple times from a number Plaintiff did not recognize. Plaintiff did not pick up. Mass then texted Plaintiff on Whatsapp to see if Plaintiff was feeling better. Mass offered to see Plaintiff for medical purposes. Mass then implored Plaintiff to come to his private office located at 400 Rella Boulevard Suite 165, Montebello, New York 10901, so there would be no "sore throats to disturb us."[1] Mass went so far as to create an appointment for Plaintiff through his person website for October 30, 2020. Plaintiff never attended the appointment.

44. On or about October 22, 2020, Mass sent Plaintiff a message, asking if Plaintiff could speak with another Defendants' employee and ask her if she would slap or spank him. Mass followed up, texting Plaintiff: "[Defendants' other employee] does not tell me anything," "**I do not care I cannot wait to [be] slapped and spanked by her**."

45. Later, on or about the same day, Mass—apparently—met with said other Defendants' employee, and told Plaintiff: "*She slapped my face very hard. I did not expect that hard. I bent down to kiss her feet. Before leaving I asked to kiss her feet without shoes. I licked her bare foot. I asked her to consider me as her slave. I asked her to hit my balls. I feel now so attached to her. I am very happy. I told her that there are no boundaries. If she wants to see naked and grab me it is OK. I told her that I would like to be sodomized be her. Of course if **would dream that you would be present to watch even if you do not do anything.** [sic].*"

---

[1] "Sore throats" is believed to be a reference to Defendants' patients.

46. Plaintiff simply responded: "Wow!"

47. Mass was not finished, and further informed Plaintiff: "*Feelings of love that arise from a good slap on my face. I hope now you and* [another employee] *will command me at Medrite.* **Would you like to see [another employee]** *sodomize me?*" Thereafter, Plaintiff stopped responding to Mass' messages. Mass knew he made Plaintiff uncomfortable and apologized.

48. On or about October 27, 2020, Mass approached Plaintiff in her office. Mass said to Plaintiff "I have a surprise for you." Mass then pulled out of his pocket a brand-new pair of woman's underwear. Mass then ripped the tag off the underwear. Mass then asked Plaintiff if she would like him to model the underwear for her. Plaintiff told Mass "no." Mass then opened his laptop briefcase and showed Plaintiff a pair of women's stockings. Mass told Plaintiff he wanted to put on the stockings and underwear for her. Plaintiff begged Mass not to and asked him to leave.

49. On or about November 3, 2020, Mass approached Plaintiff and told Plaintiff he wanted to speak to a co-worker and ask her if she would be his master and he her slave. Plaintiff did not response.

50. Later that same day, Mass approached Plaintiff and directly asked her if she would sodomize him. Plaintiff told Mass "no." Mass then asked Plaintiff if she could find an 18-year-old or if Plaintiff had any friends that might be interested in sodomizing him. Plaintiff, again, told Mass "no" and reminded him that the conversation was awkward and inappropriate. Mass then told Plaintiff he would love for her to put him on a leash and pull him like a dog.

51. On or about November 10, 2020, Mass entered Plaintiff's x-ray office. Mass opened his cellphone and told Plaintiff he had a video of himself masturbating. He asked Plaintiff if she wanted to see him masturbate. Plaintiff made it clear she had no desire to watch. Mass began

to play the video on his phone, anyway. Plaintiff looked away. Plaintiff could hear the unmistakable sounds of masturbation from Mass' phone. Plaintiff asked Mass to leave her office immediately.

52. On or about November 17, 2020, Mass entered Plaintiff's office. Plaintiff told Mass to "hold on" and Plaintiff swiveled her chair and reached for a face mask. Plaintiff put on a mask, turned around, and saw Mass taking off his belt and pulling down his pants. Plaintiff asked, in fear, what are you doing? In response, Mass took out his penis and exposed himself to Plaintiff while asking her, do you want to see or not? When exposing his genitals, Mass wore white pantyhose. To expose his penis, Mass moved his brief-underwear to the side and lifted his pale, engorged penis and pressed it against the stockings, thereby exposing his penis shaft and head. Mass then asked, again emphatically, if Plaintiff wanted to see him pull his penis out. Plaintiff told Mass "no." Despite Plaintiff making it unequivocally clear she did not want to see Mass' penis, Mass continued to expose himself.

53. Mass then left the room, leaving Plaintiff in shock and disbelief.

54. That same evening, one of Plaintiff's co-workers "Chanie" called Plaintiff and informed her she was made aware of Mass' sexual harassment because another employee—who, coincidentally, is also named Chanie and works as a medical assistant—had come forward. Additionally, Chanie told Plaintiff that Mass had approached the other Chanie and asked her to be his "master" and asked her to do "sadistic" things to him.

55. Additionally, Plaintiff learned that Defendants' patients have previously complained about Mass' behavior to Defendants' Supervisor Eliezer Gurkov.

56. On or about November 18, 2020, Plaintiff in a confused, scared, and vulnerable position, messaged Mass and begged him not to tell anyone that he exposed himself to her at work. She

shared she felt embarrassed and ashamed. Mass responded "Ok."

57. On or about November 24, 2020 at 4:43 AM, Mass attempted to call Plaintiff.

58. Plaintiff —fearing she would be sexually assaulted and sexually harassed by Mass again— could no longer work for Defendants.

59. Thereafter, in or around November of 2020, Defendants constructively terminated Plaintiff.

60. Thereafter, Plaintiff spoke to one of Defendants' Supervisor Eliezer Gurko. Gurko acknowledged Defendants had knowledge of Mass' sexual improprieties prior to hiring him. During the same conversation, Gurko stated, while referring to the Hasidic Jewish community, "*We very much try to take care of things ourselves. The last thing we do is try to make him in trouble*." Plaintiff then pointed out *she* was the victim here, not Mass. "*You're the victim, but you realize he's sick, but you don't want to make him in trouble, you want to help him,*" Gurko responded. Plaintiff was disappointed with Gurko's response.

61. At all times material, Defendants knew or should have known about Mass' propensity for sexual harassment, as Mass had a prior history at other places of employment and at MedRite.

62. At all times material, Defendants were made aware of Mass' ongoing propensity to sexually harass women, as patients complained to Defendants about Mass' behavior. Defendants took no remedial actions to combat the threat of sexual assault and harassment.

63. At all times material, Defendants' owners, including Defendant FISCH, had the ability to take corrective action but failed to take any reasonable or immediate action with respect to Mass' ongoing, unlawful behavior.

64. Plaintiff was subjected to a hostile work environment because of her gender.

65. Plaintiff was constructively terminated due to the ongoing hostile work environment and Defendants' own willful, wanton, and reckless negligence.

66. Because of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, bonuses, benefits, and other compensation which such employment entails. Plaintiff has also suffered pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

67. Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting condition.

68. As Defendants' conduct has been malicious, willful, outrageous and conducted with full knowledge of the law, Plaintiff demands Punitive Damages against Defendants.

69. The above are just some of the examples of unlawful discrimination to which the Defendants subjected the Plaintiff on a continuous and on-going basis throughout Plaintiff's employment.

<strong>AS A FIRST CAUSE OF ACTION<br>DISCRIMINATION UNDER TITLE VII<br><u>(NOT AGAINST INDIVIDUAL DEFENDANTS)</u></strong>

70. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

71. Title VII states in relevant part as follows:

    "(a) Employer practices:

    It shall be an unlawful employment practice for an employer:

    (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

72. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, for relief based upon the unlawful employment practices of the above named Defendant. Plaintiff complains of Defendant's violation of Title VII's prohibition against discrimination in employment based,

in whole or in part, upon an employee's gender or disability.

73. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e et seq., by constructively terminating, subjecting Plaintiff to a hostile work environment, and otherwise discriminating against Plaintiff as set forth herein because of Plaintiff's gender.

**AS A SECOND CAUSE OF ACTION FOR
RETALIATION UNDER TITLE VII
(NOT AGAINST INDIVIDUAL DEFENDANTS)**

74. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

75. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e-3(a) provides that it shall be unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

76. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e seq. by discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of his opposition to the unlawful employment practices of Defendants.

**AS A THIRD CAUSE OF
ACTION UNDER STATE LAW
DISCRIMINATION**

77. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if set forth herein more fully at length.

78. New York State Executive Law § 296 provides that: "1. It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability,

predisposing genetic characteristics, familial status, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

79. Defendants violated the section cited herein by constructively terminating, creating and maintaining discriminatory working conditions, and otherwise discriminating against the Plaintiff because of Plaintiff's sex.

## AS A FOURTH CAUSE OF ACTION UNDER STATE LAW
### AIDING & ABETTING

80. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

81. New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

82. Defendants participated in, aided, abetted, and encouraged Defendants' employee to unlawfully harass and retaliate against Plaintiff.

83. Defendants violated the section cited herein as set forth.

## AS A FIFTH CAUSE OF ACTION UNDER STATE LAW
### RETALIATION

84. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if set forth herein more fully at length.

85. New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or

discriminate against any person because [s]he has opposed any practices forbidden under this article."

86. As a direct consequence of Plaintiff refusing to engage in sexual acts and opposing unlawful activity by the Defendants, Defendants unlawfully retaliated against Plaintiff.

87. Defendants violated the section cited herein as set forth.

**AS A SIXTH CAUSE OF ACTION
INTENTIONAL INFLICTION
OF EMOTIONAL DISTRESS
(AS AGAINST DEFENDANT MASS)**

88. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if set forth herein more fully at length.

89. Defendant MASS purposefully and intentionally engaged in extreme and outrageous conduct, as described herein.

90. Defendant MASS' conduct has caused and continues to cause Plaintiff severe emotional anguish, pain and suffering, and other non-pecuniary damage.

**AS A SEVENTH CAUSE OF ACTION
ASSAULT & BATTERY
(AS AGAINST DEFENDANT MASS)**

91. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if set forth herein more fully at length.

92. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of the Complaint as set forth at length herein.

93. Under New York law, assault is the (i) intentional placing (ii) of another person (iii) inreasonable apprehension (iv) of imminent harmful or offensive contact. *See United Nat. Ins.Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d. Cir. 1993).*

94. Under New York law, as a result of the assault, a defendant commits battery when (i) there

was bodily contact, (ii) the contact was offensive and (iii) the defendant intended to make the contact. *Id.*

95. Defendant Mass placed Plaintiff in reasonable apprehension of immediate harm and/or offensive contact.

96. Plaintiff suffered damages as a result.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

Date: July 19, 2021
New York, New York

Respectfully Submitted,

**DEREK SMITH LAW GROUP, PLLC**

By: */s/ Alexander G. Cabeceiras*
Alexander G. Cabeceiras, Esq.
One Penn Plaza, Suite 4905
New York, NY 10119